UNITED STATES, Appellee,

v

JACK L. BENNINGTON, First Lieutenant, U. S. Army, Appellant

12 USCMA 565, 31 CMR 151

No. 15,087

December 15, 1961

First Lieutenant Richard A. Baenen argued the cause for Appellant, Accused. With him on the brief was Lieutenant Colonel Ralph Herrod.

First Lieutenant Carl F. Wrench argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel James G. McConaughy and Major Francis M. Cooper.

## Opinion of the Court

KILDAY, Judge:

Tried by general court-martial for sodomy, in violation of Article 125, Uniform Code of Military Justice, 10 USC § 925, accused was found guilty despite his contrary plea and was sentenced to dismissal. The convening authority approved and a board of review in the office of The Judge Advocate General of the Army affirmed. Accused then sought relief before this Court and we granted his petition for review in order to consider arguments on several issues. Because of the disposition we make it is necessary that we inquire into one area only. Nonetheless, development of the background and a somewhat extended recitation of the facts germane to the question we reach is appropriate.

The allegation of disgusting and re-

pulsive misconduct with which we are concerned in the instant case is purported to have taken place at Fort Knox, Kentucky, where both the accused officer and the complaining witness—one Silvis—were stationed as members of the Military Police Company. The former was a first lieutenant and, at the time of the transaction, was thirty-one years of age. He was married and living with his wife and their two young children, and enjoying—for aught that appears—a normal happy relationship. He had twice previously received honorable discharges and had over eleven years' prior service, both as an enlisted man and an officer; had attended a noncommissioned officers' academy while serving in Europe; and thereafter had secured his commission through suc-

cessful completion of the prescribed course at officers' candidate school. Never had he been accused or tried for any offense, either in the service or as a civilian. Nor had he ever been subjected to nonjudicial punishment under Article 15, Uniform Code of Military Justice, 10 USC § 815. In short, the character of his service was excellent.

On the other hand, the witness leveling the finger of criminality at accused had only enlisted in the Army three and one-half months before the date of the alleged offense. Previously Silvis had served four years in the Marine Corps and during that time he was convicted by court-martial for, *inter alia,* assaulting a military policeman. Also, he admitted on cross-examination that during his Marine service in the Far East he had participated in an act of fellatio with a prostitute. Moreover, he acknowledged he had accepted money from a civilian in Japan to indulge in a homosexual act, but asserted he had not carried out such agreement and had just run off with the money. Further, he testified at trial he did not believe it improper to convert to himself the consideration obtained upon the false pretense of agreeing to submit to an act of fellatio. Additionally, with regard to the witness' association with the civilian pervert, it should be noted the record shows prior inconsistent statements by him; contrary to his trial testimony, Silvis had variously failed to mention the existence of any act of this kind even though inquiry was made and, in other statements, he had indicated that an unnatural act had in fact been consummated with the civilian. Silvis, it is fair to state, was not by any set of standards a particularly savory individual. Indeed, in presenting him as the principal prosecution witness, trial counsel did not pretend he was a naive innocent.

On the evening in question, one of the platoons of the military police unit at Fort Knox held what may be described in the common vernacular as a "beer bust." Accused, one of the officers of the unit, had been invited and was present. He had driven to the site of the party, on the reservation, in his private automobile. Also present was the complaining witness, who was a private first class and had arrived in another man's car. During the course of the evening Silvis and another soldier, who apparently were aware how accused had obtained his commission and evinced some similar interest for themselves, conversed with him about officers' candidate school. This conversation took place in accused's car while the refreshments were being consumed, and others in addition to the above three men were present. The record shows that both Silvis and accused imbibed substantial quantities of intoxicants during the course of the evening —each had approximately a dozen cans of beer and some five or six whiskey drinks. The supply of potables was exhausted presently, however, and the party broke up. This was at about 10:30 p. m., and at that juncture accused apparently issued a general invitation to those present, offering to drive anyone who desired a ride back to the barracks. It also appears no special invitation was given to Silvis, but he alone of those to whom the offer was made, accepted. The two then departed in the lieutenant's auto.

The facts indicate that while en route accused suggested they procure more beer and, in order to obtain funds for its purchase, stopped by his quarters where his wife and children were, in all probability at this late hour, asleep. From there they proceeded to a tavern located off the base where they bought additional beer, then drove to a rather isolated road on the reservation where they parked. Accused testified that they there continued the conversation about officers' candidate school, drank the beer, and left. Silvis, on the other hand, asserted that in the car at that time and place accused committed upon him the act of sodomy *per os* as to which the court-martial returned a finding of guilty.

According to the complaining witness, accused was in the act of oral sodomy when a military police vehicle stopped behind them and one of its occupants approached their car. The military policeman described the locale, and testified that his headlights would not have been noticeable by the occupants

of the parked car until he swung around a curve just a short distance away. All parties are in agreement that but an extremely short interval elapsed after the headlights were visible until the military policeman was at the parked car. Indeed, the latter estimates the time could not have exceeded five seconds. Yet when he approached the car he saw nothing awry, nor anything untoward about the occupants or their clothing. As a matter of fact, he recognized the lieutenant as his superior and entered into a conversation for several minutes before leaving. No one seemed excited or anxious to hasten his departure. It is not without interest that as he approached, according to the military policeman, the complaining witness was drinking a can of beer and offered him one, but he demurred. When the police patrol had departed, Silvis claimed the lieutenant resumed and completed an action of fellation. Thereafter, accused drove the alleged pathic to his barracks, thence proceeded home to his own quarters.

During the course of his testimony on direct examination by trial counsel, Silvis was permitted to testify that upon reaching his billet, he had advised the man with whom he shared a cubicle of accused's act. The prosecution also introduced the cubicle mate's testimony to the same effect. Defense counsel's timely objection that this evidence was not properly admissible under the theory of fresh complaint, was overruled by the law officer, and the corroborating witness was also permitted to testify that when they arose next morning, Silvis repeated his previous statement.

Accused testified in his own behalf and consistently denied the charges against him. Further, and notwithstanding either the revolting nature of the accusation or the fact Silvis had been granted immunity by the commanding general who convened the court-martial, some ten witnesses, including some enlisted personnel and ranging through the grade of lieutenant colonel, testified in accused's behalf. One of these was, at the time of trial, a civilian and traveled at his own expense to put his testimony before the court members. This array of witnesses included both superiors and subordinates of accused, one of whom had known him for some twelve years. The substance of their testimony was that accused was a fine, dependable and hard working officer with outstanding qualities; that his reputation was good; and that he was trustworthy and to be believed. Specifically, several witnesses had frequently performed surveillance and similar duty with accused late at night, and were alone with him in an automobile. Never, however, did accused make any homosexual suggestions or overtures. Neither did he exhibit any such tendencies nor discuss that subject. In similar vein was the written statement of an officer who had attended officers' candidate school with accused. Additionally, a chief warrant officer, who investigated this allegation and appeared as a Government witness, testified on cross-examination that accused was a fine officer; that he would believe him; and that his opinion of accused had not changed since the date of the alleged incident. And the defense also introduced evidence showing that accused had, during one hiatus in his Army career, been granted a top security clearance by the Atomic Energy Commission. The investigation conducted in clearing accused had turned up no information indicating homosexual acts or tendencies on his part.

It is with that general factual pattern we commence our inquiry, and in so doing we must keep in mind the principle that:

". . . a conviction cannot be based upon the uncorroborated testimony of an alleged victim in a trial for a sexual offense, or upon the uncorroborated testimony of a purported accomplice in any case, if such testimony is self-contradictory, uncertain, or improbable."

Manual for Courts-Martial, United States, 1951, paragraph 153a; United States v Henderson, 4 USCMA 268, 15 CMR 268. Manifestly, this rule is ap-

plicable in the case at bar. Not only are we here concerned with a sex offense, but it should be noted that Silvis' own testimony made him out to be a willing participant. While he lamely asserted such acts were distasteful to him and that he probably would not have consented but for his indulgence in alcohol, these contentions fly full in the face of the admitted prior course of conduct by a man who acknowledges he has previously and voluntarily participated in an act of unnatural connection, and who sees no wrong in stealing from a pervert with whom he associated upon the false pretense of agreeing to similar homosexual activity. Moreover, he made no outcry nor protest, and in fact averred that he assisted in removal of his trousers to facilitate the alleged act. Beyond peradventure, Silvis comes within the purview of both branches of the above-quoted rule.

And we are equally certain that evaluation of his testimony demonstrates the requirement for corroboration thereof. Without belaboring the point, suffice it to state that on cross-examination, the alleged victim made several self-contradictory statements concerning what had transpired in accused's car. Likewise, there were elements of uncertainty as to some details, and an aura of improbability to his story. And in many instances he replied weakly that he did not remember.

Only Silvis and accused, of course, testified regarding what had transpired in the latter's automobile. And the evidence showing that ac- cused was parked, late at night and in an isolated area, with the purported pathic, does not necessarily constitute persuasive corroboration for the latter's allegations. Accused, after all, did not and does not deny his presence at the time and place involved and, when the evidence in its entirety is considered, the military policeman's testimony might even fairly be susceptible to the construction that nothing untoward occurred. Thus, it could be considered of little significance that the site was rather isolated, for the area was patrolled by military police and the rec-

ord reflects that, as an officer in such unit, accused was aware of that fact.

Neither is there necessarily reason for undue concern over the fact that two men would repair to such a place to consume the additional beer they had procured. While it may not have been the best of choices, both individuals were, after all—in light of the quantity of intoxicants each had admittedly imbibed—obviously under the influence to a greater or lesser degree. Picking such a locus for continued drinking and conversation would not seem to be an unusual election for men in that state, nor a circumstance of particularly suspicious import. But even ascribing better judgment to the pair, this evidence may not be damaging to accused, as it may be argued the lieutenant and his companion would not go to the latter's enlisted barracks, where other soldiers were retired. And certainly it is understandable accused would not suggest going to his home, where his family was asleep, for a wee hour drinking spree. Nor, surely, is it surprising that the Lieutenant would not wish to do his drinking in the establishment where the beer was purchased. He stated he did not care to frequent such places, which is quite logical in light of the fact that as a military police officer, his fraternizing in bars he must police could compromise his authority.

Further, the fact that the witness who came upon the scene while on patrol noted no disarray of clothing nor anything else untoward, can be said to suggest innocent—not culpable—circumstances. It is admitted that only bare moments elapsed before accused and Silvis could be aware of that witness' proximity until he was at the scene. Yet, despite the time element and the fact Silvis concedes he was so drunk as to have trouble tying a shoe or shaving, he claims—after having been surprised almost literally *flagrante delicto*—to have pulled up his tight-fitting trousers and fastened them, and otherwise rearranged his clothing and resumed a normal appearance. Such a feat, it may be argued, would, even by a sober man, strain credulity. Likewise, it is not without significance that no effort was

made to speed the military policeman on his way. Rather, a relaxed conversation was had, and the alleged pathic—even though admittedly a willing partner who assisted in the purported act—offered the patrolman a beer, which would have further delayed his departure.

That brings us to the critical issue. Under all the circumstances, the corroboration for Silvis' testimony which might be found in the statements he made to his cubicle mate, assumes substantial importance for—at the risk of understating the proposition—the Government's case is far short of compelling.

In that connection, it must be borne in mind, as paragraph 153a of the Manual, supra, enjoins:

"In general, a person gains no corroboration merely because he repeats a statement a number of times. Hence, a witness ordinarily may not be corroborated by showing that he made statements consistent with his testimony."

Of course, that injunction is subject to certain recognized exceptions, among which the Manual sets forth the following:

"In prosecutions for sexual offenses, such as rape, carnal knowledge, sodomy, attempts to commit such offenses, assault with intent to commit rape or sodomy, and indecent assaults, evidence that the alleged victim of such an offense made complaint thereof within a short time thereafter is admissible. This evidence is to be restricted to proof that the complaint (including the identification of the offender) was made, a description of the details of the offense given during the course of making the complaint being inadmissible under this rule. Evidence of fresh complaint, as such, is received solely for the purpose of corroborating the testimony of the victim and not for the purpose of showing directly the truth of the matters stated in the complaint." [Paragraph 142c, Manual for Courts-Martial, United States, 1951.]

The above-quoted provision was before this Court somewhat obliquely in United States v Mantooth, 6 USCMA 251, 19 CMR 377. In that instance the issue before us concerned the law officer's refusal of a defense requested instruction on lack of complaint, and in deciding that question the Court volunteered the observation that the military rule regarding admissibility of evidence of fresh complaint was perhaps broader than that in some other jurisdictions. However that may be, though, it is quite plain—as we also observed in Mantooth, supra—that a voluntary and consensual sodomy between two willing adult male participants is a sort of sex offense following which any variety of complaint would be extraordinary.

That is the very factor we find missing in the case at bar. Indeed, such was the basis of the objection interposed by the defense at trial. It was there urged that Silvis had not at all made fresh complaint, and in our view the record bears out that contention.

Admittedly, Silvis voiced no complaint of any kind to the patrolman who happened upon the scene of the alleged offense. And, as a matter of some interest, the evidence of record indicates there may be a hiatus of up to two hours—and for which the self-proclaimed victim cannot account—between the time the repulsive act is supposed to have occurred and the hour his cubicle mate avers the statement was made to him. But irrespective of those factors, the report Silvis made after his return to the barracks just does not measure up to a complaint. As we have previously pointed out, consent and force are not involved—either as elements or otherwise—in the present instance. Further, the purported pathic admits he was not sufficiently bothered over the alleged incident that he took pains to arouse his cubicle mate; Silvis, in fact, does not know whether the other man was already awake or whether he disturbed him with the noise he made incident to retiring himself. Moreover, there is no showing the communication was occasioned by shock, outrage, resentment or even disgust. Cf. United States v Stell, 4 CMR 490.

Indeed, on cross-examination Silvis admitted he was not ashamed of the act at the time of the report and, with regard to why he made a statement to his barracks companion, he testified he did not know. No suggestion was advanced, even, that although not personally outraged, he was giving notice to other unwitting personnel on whom a pervert might prey. Interestingly, when defense counsel leveled the accusation that the report made to the cubicle mate was bragging on Silvis' part, the latter lamely answered, "I just thought he should know, so I told him. He was awake." And, finally, as indicative of what significance the pair attached to the reported misconduct involving accused, it is to be noted both were so interested and concerned that after the information had been related they held no further conversation but went to sleep.

With the record in that posture, we are constrained to hold it was improper to admit evidence of prior statements by the alleged pathic. The reports made by Silvis to his cubicle mate seem to constitute no more than ordinary barracks gossip at best or, at the other end of the scale—as defense counsel implied—malicious bragging over implicating a respected officer with a disgusting and degrading charge. We fully appreciate that, in order to qualify for admission as a fresh complaint, a prior statement need not be made under circumstances which would render it—together with a recital of all details—admissible as a spontaneous exclamation under paragraph 142b, Manual for Courts-Martial, United States, 1951. See United States v Knight, 12 USCMA 229, 30 CMR 229, and cases therein cited. Neither need it always fit a literal definition of "complaint." See paragraph 142c of the Manual, supra; and United States v Stell, supra. Nonetheless, there can be no doubt that more is required, when a voluntary consensual sodomy between adult males is involved, than is present in the case at bar. The instant situation is utterly devoid of factors upon which admissibility might be predicated. It is not unlike that in Callahan v United States, 240 Fed 683 (CA 9th Cir) (1917), where a prior statement by the alleged victim of a statutory rape was ruled inadmissible in the following language:

"In the case at bar there is entire absence of circumstances to justify the admission of testimony such as that given by Laura Herrington. The statement of which she testified was made to her, not as a complaint, not as the expression of outraged feeling, not under excitement produced by an external shock, but purely as a matter of interesting information in a casual conversation. . . ."

We are left, then, with the sharply contradictory evidence of accused and Silvis and, since the testimony given by the latter was improperly bolstered by the inadmissible evidence of "fresh complaint," this conviction must be overturned.

For the above-stated reasons the decision of the board of review is reversed. The findings and sentence are set aside and the case is remanded to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge QUINN and Judge FERGUSON concur.